Gary Eldon ALVORD, a/k/a Paul Robert Brock, a/k/a Gary Eldon Venczel, Petitioner,

v.

Louie L. WAINWRIGHT, Secretary, Florida Department of Corrections, Respondent.

No. 81-366 Civ-T-BK.

United States District Court, M.D. Florida, Tampa Division.

March 23, 1983.

On Motion to Alter or Amend Judgment May 5, 1983.

William J. Sheppard, Sheppard & Caruthers, P.A., Jacksonville, Fla., for petitioner.

James C. Smith, Atty. Gen., Carolyn Snurkowski, Asst. Atty. Gen., Tallahassee, Fla., Charles Corces, Jr., Asst. Atty. Gen., Tampa, Fla., for respondent.

## MEMORANDUM OPINION

KRENTZMAN, Senior District Judge.

Gary Eldon Alvord, a Florida state prisoner under sentence of death for a triple murder, petitions this Court for a writ of habeas corpus, 28 U.S.C. § 2254, attacking his conviction and sentence on numerous grounds.

In 1970, petitioner was tried for kidnapping and rape in Michigan, found not guilty by reason of insanity, and committed to the custody of the Michigan Department of Mental Health. In January 1973, Alvord escaped from Michigan's Ionia State Hospital and eventually came to Tampa, Florida. He was indicted on August 1, 1973 for the June 1973 murders of three women, and Thomas Meyers, Esquire, a part-time public defender in the Circuit Court for Hillsborough County, was appointed to represent

him. The trial court found Alvord competent to stand trial. Alvord plead not guilty and took the stand at trial to present an unsupported alibi defense. The state presented circumstantial evidence, a statement made by Alvord upon his arrest, and the testimony of Alvord's girlfriend, to whom he had allegedly confessed the crimes. Petitioner was convicted on all three counts of first degree murder on April 4, 1974. Later that day, the court held the sentencing phase, at which Dr. Ames Robey, a psychiatrist who had treated Alvord in Michigan, was the only witness. The jury returned an advisory sentence recommending the death penalty, and the judge sentenced Alvord to death.

The conviction and sentence were affirmed by the Florida Supreme Court on direct appeal. *Alvord v. State*, 322 So.2d 533 (Fla.1975), *cert. denied*, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). Petitioner's motion for post-conviction relief pursuant to Rule 3.850, Fla.R.Crim.P., was denied by a state circuit judge on August 27, 1979,[1] and that denial was affirmed by the Florida Supreme Court on April 9, 1981. *Alvord v. State*, 396 So.2d 184 (Fla.1981). Petitioner was scheduled to be executed on May 6, 1981.

Alvord petitioned this Court for habeas corpus and moved to stay his execution on April 21, 1981. The state's response was, and for the most part remains, that petitioner received a full and fair hearing in the state courts, and that the state court findings and conclusions must be presumed correct under section 2254(d), 28 U.S.C. This Court stayed petitioner's execution and denied the state's motion for judgment on the pleadings. Petitioner's motion for discovery on the issues of ineffective assistance of counsel and inadequate psychiatric examination was granted, and the Court conducted an evidentiary hearing on those two grounds on May 13 and 14, 1982. Dep-

ositions of Drs. Sprehe and Gonzalez were received in evidence, and Dr. Robey, trial counsel Thomas Meyers, and appellate counsel Richard Seymour each testified at the hearing. The parties submitted pre-hearing, post-hearing, and final memoranda.

Alvord bases his petition on twelve grounds. Two of those grounds raise issues that have for some time been pending in the courts of appeals. On April 28, 1982, the Eleventh Circuit ordered rehearing en banc in *Ford v. Strickland*, 676 F.2d 434 (11th Cir.1982), the case presenting as an issue the constitutionality of the Florida Supreme Court's review of nonrecord material in the course of considering capital appeals. The decision of the en banc court was released on January 7, 1983. 696 F.2d 804 (11th Cir.1983). Also, on May 14, 1982, Unit B of the former Fifth Circuit ordered rehearing en banc in *Washington v. Strickland*, 673 F.2d 879 (5th Cir. Unit B), *rehearing granted*, 679 F.2d 23 (5th Cir. Unit B 1982), a case presenting important issues underlying the claim of ineffective assistance of counsel asserted by petitioner herein.[2] The decision of the en banc court in *Washington* was rendered on December 23, 1982. 693 F.2d 1243 (5th Cir.1982). Resolution of this petition while *Ford* and *Washington v. Strickland* were pending would have been premature.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. *Representation at Trial*

█ Petitioner raised his ineffective assistance claim on state collateral review pursuant to Rule 3.850, Fla.R.Crim.P. In denying petitioner's motion, the state court made certain findings of historical fact which this Court generally presumes correct, 28 U.S.C. § 2254(d), but the conclusion of the state court that petitioner received

---

1. Petitioner first moved for reduction of sentence pursuant to Rule 3.800(b), Fla.R.Crim.P., on November 29, 1976. The motion was denied, and the Supreme Court of Florida denied a petition for mandamus on March 10, 1977 (unreported).

2. Decisions of Unit B of the former Fifth Circuit bind this Court. *County of Monroe v. Department of Labor*, 690 F.2d 1359 (11th Cir. 1982); *Stein v. Reynolds Security*, 667 F.2d 33 (11th Cir.1982).

effective assistance of counsel is not to be presumed correct under 2254(d). Whether counsel has rendered effective assistance is a mixed question of law and fact, requiring this Court to apply sixth amendment principles to the historical facts of the case. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Sullivan v. Wainwright,* 695 F.2d 1306, 1308 (11th Cir. 1983); *Young v. Zant,* 677 F.2d 792, 798 (11th Cir.1982); *Harris v. Oliver,* 645 F.2d 327, 330 (5th Cir.1981).

The state court found, in addition to the facts recited above, that petitioner's trial counsel, Mr. Meyers, "was aware of [Alvord's] adjudication of insanity and that [Alvord] was presumed to remain incompetent until adjudicated otherwise." *State v. Alvord,* No. 73–1398 (Cir.Ct. August 27, 1979) (order denying post-conviction relief) (hereafter, Rule 3.850 Order).[3] The collateral review court also found that Mr. Meyers moved the trial court on several occasions to appoint Drs. Sprehe and Gonzalez to examine his client and that counsel tried in vain to persuade Alvord to cooperate. Alvord did not want to raise the insanity defense, however, and refused to cooperate each time the doctors were appointed to examine him. Finally, the court stated that

"no proof of [Alvord's] prior adjudication was ever submitted to the Court and no such defense was raised." Rule 3.850 Order at 10. This Court presumes correct each factual finding made by the state court, with the single exception of its finding that no proof of the Michigan adjudication was submitted to the trial court.[4] Nevertheless, additional facts not inconsistent with the state court's findings are relevant to petitioner's sixth amendment claim.

### 1. Background and Trial.

Petitioner was in and out of mental hospitals in Michigan since the age of 13; his mother also suffered from mental illness. He was charged with the kidnapping and rape of a ten-year-old girl in 1967, and spent more than two years in a mental institution before being declared competent to stand trial. In 1970, he was adjudicated not guilty by reason of insanity by a Michigan judge after a bench trial.[5] Alvord was institutionalized and, in January 1973, he escaped from the Ionia State Hospital in Michigan. The murders were committed in Florida in June 1973, and Alvord was indicted on August 1, 1973.

Mr. Meyers was appointed to represent petitioner about two weeks after the indictment was returned.[6] Mr. Meyers had tried some fifteen or twenty felony cases to a

---

**3.** The Rule 3.850 Order appears in Volume Six of Respondent's Composite Exhibit One.

**4.** In denying petitioner's motion for post-conviction relief, the state court concluded that Mr. Meyers "fully explored" the insanity defense. Rule 3.850 Order at 9. Such statements are more than findings of historical fact; they amount instead to the court's conclusions leading to its holding that Alvord received effective assistance of counsel. As such, they do not have section 2254(d)'s presumption of correctness.

**5.** During the period in question, Michigan applied a broader standard for determining insanity than did Florida. Florida applied the M'Naghten test: whether the defendant understood the nature of the act and that it was wrong at the time of the offense. *Camp v. State,* 149 So.2d 367 (Fla.App.1963). Michigan applied both the M'Naghten and irresistible impulse tests: whether the defendant could control his actions at the time of the offense. The Michigan judgment holding Alvord not guilty

by reason of insanity does not state the ground on which it was based. At evidentiary hearing, petitioner suggested that it was based on the M'Naghten standard. An entry in Alvord's medical record shows that the psychiatrist who testified at the Michigan trial considered Alvord not to know right from wrong, I Medical Appendix 58, and Dr. Robey stated that he knew from discussions with the testifying doctor that such was the basis of the adjudication. *See* Trial Rec. at 1156. Florida law apparently gives full effect to a foreign adjudication without regard to the foreign state's test for insanity. *Hixon v. State,* 165 So.2d 436 (Fla.App. 1964). See note 16, *infra.*

**6.** The system then in effect provided for two part-time public defenders who shared the cases assigned to each judge. The benefits of that system were familiarity and cooperation; the expense was a lack of independent advocacy in some cases.

jury at the time of his appointment, but he had tried none in which an insanity defense was raised. Meyers Depo. at 69. This was one of the first capital cases tried in the Thirteenth Judicial Circuit under Florida's revised death penalty statute. Mr. Meyers was assigned three first degree murder cases during 1973, and was in trial in his first such case in the fall of that year. The attorney first saw his client in September 1973 for about fifteen minutes. Alvord refused to talk to counsel other than to ask him to collect all the evidence he could and to come back. Meyers Depo. at 11. Mr. Meyers learned from the prosecutor that Alvord had suffered from mental problems since an early age, had spent many years in mental institutions, and had been adjudicated not guilty by reason of insanity in Michigan. Meyers' subsequent pre-trial contact with his apparently uncooperative client was primarily at court hearings.

In early October, Mr. Meyers moved off the record for a mental examination of his client. See Trial Rec. at 164, 227. But see Trial Rec. at 4 (order to determine mental condition of defendant).[7] On October 9, 1973, the trial court directed that Alvord be examined by two court-appointed psychiatrists, Drs. Sprehe and Gonzalez. Both doctors attempted to examine Alvord, but he refused to talk to them without his attorney present. At a competency hearing on October 12, 1973, the doctors described Alvord's response, but could give no opinions as to his mental state. Trial Rec. at 129–32. Mr. Meyers informed the doctors and the court of Alvord's six-year history in mental institutions whereupon both Doctor Gonzalez and the prosecutor stated that in similar cases in Florida the defendant was sent to a state hospital for observation. The court continued the hearing until October 19, 1973, when it stated that the prosecutor had suggested the defendant be sent to the state hospital for observation and that his Michigan records be obtained. Trial Rec. at 133–35. The prosecutor had also mentioned Dr. Robey as a psychiatrist who had treated Alvord for several years in Michigan.[8] The hearing was continued until November 2, 1973, when the court announced its order committing Alvord to the Florida State Hospital for observation and examination. Trial Rec. at 136–37; see Trial Rec. at 10 (Order of Commitment). A month later, on December 6, 1973, the court set aside its commitment order without a hearing, having been told by the state hospital that the court had no authority to commit Alvord for observation. Trial Rec. at 14 (Order Setting Aside Commitment); see Trial Rec. at 140. About the middle of December, Mr. Meyers learned from the prosecutor that Alvord had not gone to the mental hospital. He did not move to have his client committed for observation until March 26, 1974, a few days before trial.

At the invitation of the state,[9] Dr. Robey came to Florida on January 3, 1974 to examine Alvord; it was the doctor's understanding that the court and both counsel had requested the examination. Trial Rec. at 161–63. Alvord was surprised to see Dr. Robey, complained that he had not seen his attorney for three months, and talked to the doctor for several hours. On January 5, 1974, the court had a hearing at which Mr. Meyers learned for the first time that Dr. Robey had examined his client. Trial Rec. at 138–74; Meyers Depo. at 30–31. Meyers objected to the lack of notice, Trial Rec. at

---

7. For clarity, the Court will refer to the consecutively paginated trial transcript, including papers filed with the trial court and transcripts of pretrial hearings, as "Trial Rec." When the consecutive page numbers are difficult to discern, the Court will cite the transcript pages as well.

The Court will also occasionally refer to the deposition testimony of trial counsel, appellate counsel, and Dr. Robey. Such references are for illustrative purposes only; all findings are based on the state court record or on testimony adduced at the evidentiary hearing. See 28 U.S.C. § 2246.

8. Dr. Robey testified at the sentencing hearing that he first saw Alvord in Michigan in November 1969, Trial Rec. at 1144, and that he saw him "more or less continuously from 1969 up until the time of his escape in 1973." Id. at 1168.

9. Rule 3.850 Order at 5; see Trial Rec. at 15 (Dr. Robey's Report, January 9, 1974).

168, but Dr. Robey was allowed to testify at the hearing that his examination of Alvord led him to the opinion that petitioner was indeed competent to stand trial. The doctor also testified that the Michigan courts had referred Alvord for examination some five times over the years during which he had supervised Alvord's mental treatment, that Alvord had escaped from a Michigan mental institution, and that his illness was of a type that could suddenly recur or go into long remissions. He stated that he knew more about Alvord than any other doctor in Michigan, but gave Mr. Meyers the names of two other treating psychiatrists. Trial Rec. at 160–61. The trial court granted the state's motion, in which Mr. Meyers joined, for further mental examination by Dr. Robey to determine Alvord's sanity at the time of the offense, but stated that "if the defendant continues to refuse to talk to [Drs. Sprehe and Gonzalez], then the Court has no alternative but to deny any defense of insanity that may be raised in this case." Trial Rec. at 167.[10] Just before the hearing ended, Alvord moved the court to discharge Mr. Meyers as his counsel, stating he had "no faith in any persons representing the Public Defender's Office." Trial Rec. at 171. The court responded by letting Alvord "take this up with the Public Defender .... You might accommodate him by filing a written motion, Mr. Meyers, if you so desire." Trial Rec. at 171–72; see Trial Rec. at 188–89.[11] Thereafter, Alvord apparently asked Mr. Meyers not to file such a motion. Meyers Depo. at 34.

Dr. Robey examined Alvord later that day for slightly over two hours and wrote a letter to the court and counsel from Michigan on January 9, 1974, giving his opinion that under Florida's M'Naughten standard, Alvord was criminally responsible at the time of the offense. Trial Rec. at 15 (opinion letter of Dr. Robey). On January 10, 1974, the court again directed that Alvord be examined by the court-appointed psychiatrists. Trial Rec. at 17. At a competency hearing on January 11, 1974, Dr. Sprehe gave a qualified opinion that Alvord was competent to stand trial; the doctor was uncertain because he had been able to spend less than ten minutes with petitioner, who was still uncooperative. Trial Rec. at 175. Dr. Gonzalez stated no opinion because Alvord had only spoken to him for three to five minutes. The court found Alvord competent to stand trial: "I have no alternative under the circumstances but to presume, first of all, that the defendant is competent to stand trial until I am shown otherwise, and that the presumption is now even strongly enhanced by the psychiatric report of Dr. Robey. So, I will adjudicate the defendant competent to stand trial." Trial Rec. at 189.

On February 5, 1974, with a February 25 trial date approaching, the court issued a third order, again directing the court-appointed doctors to try to examine Alvord.[12] At hearing on February 8, 1974, Dr. Sprehe, having spent fifteen minutes with Alvord, testified that in his opinion Alvord was competent to stand trial. Trial Rec. at 200–10. Dr. Gonzalez testified a week later that he still was without an opinion because he had again found Alvord uncooperative; he suggested that Alvord be committed for observation. Trial Rec. at 211–22. Neither doctor stated an opinion about Alvord's sanity at the time of the offense. The following colloquy between the court and Mr. Meyers took place at the February 15, 1974 hearing:

10. Later, the judge made the same observation: You know, you can't have your cake and eat it too. You either got to go one way or the other. You either want to be examined to determine if you have a mental defense or you don't want to be examined. If he doesn't want to be examined and he is not going to present any defense of insanity in this case, I am sure that the State is ready for trial. Trial Rec. at 169.

11. See also Trial Rec. at 27 (Alvord's January 22, 1974 handwritten motion to discharge the public defender; denied by the court); Trial Rec. at 195–99.

12. This time, the court's order indicates that it was issued on defendant's motion. Trial Rec. at 58.

The Court: [H]e failed to cooperate with the doctors. He then through his attorney requested that I give him another opportunity. He evidently did cooperate with one doctor. But now refused to with this doctor.

Mr. Meyers: The problem here, Judge, he was up in Michigan been adjudicated incompetent.

The Court: I don't know that.

Mr. Meyers: There is a legal presumption that a person is, once adjudicated, is incompetent until adjudicated otherwise.

The Court: I have no knowledge of this. There has been nothing shown to this Court that he has ever been adjudicated incompetent on the basis of any document or testimony. This Court doesn't have that before it. And until such time as the Court has something of that nature before it, I have to presume the defendant to be competent.

Mr. Meyers: Okay. Well, I have no further questions, Judge.

Trial Rec. at 216–17. The Court again declared Alvord competent to stand trial.

On the prosecutor's motion, trial was continued from February 25 to April 1, 1974. On March 26, 1974, Mr. Meyers filed a notice of intent to claim insanity, now inexplicably absent from the trial record.[13] He also filed a motion to transfer Alvord to a state hospital, to which motion he attached the Michigan adjudication of insanity and order of commitment. The motion was denied. See Trial Rec. at 71–75. Mr. Meyers moved to dismiss the indictment on March 28, 1974, citing legal grounds ranging from the age of those serving on the indicting grand jury to the unconstitutionality of the death penalty. Trial Rec. at 78.

Trial began on April 1, 1974. As part of its strong case against Alvord, the state introduced a statement made by petitioner to a detective upon his arrest in Michigan for theft; Alvord apparently stated that he was not a thief, he was a rapist. Trial Rec. at 922. On direct examination, Mr. Meyers asked Alvord to explain that statement:

Mr. Meyers: Well, did you make the statement that he said you made, though?

Alvord: Probably did, yes.

Mr. Meyers: And why did you say that?

Alvord: Well, then, again—can I ask somebody a question here?

Mr. Meyers: No. Just go ahead and answer the question. Why did you say that statement to him.

Alvord: Because I was acquitted for kidnap and rape previously. Maybe—

Mr. Meyers: For what reason?

Alvord: By reasons of insanity.

Mr. Meyers: All right. Is that what you were referring to?

Alvord: Yes.

Mr. Meyers: And were you at all referring to any murders in Tampa?

Alvord: Definitely not.

Trial Rec. at 975–976.

The fact that Alvord had previously been found not guilty of kidnapping and rape by reason of insanity and the fact that he escaped from a Michigan mental hospital in 1973 arose at several other points during the trial. Mr. Meyers moved for a mistrial on the morning of the third day of trial, arguing that a newspaper article had appeared that morning describing "Mr. Alvord's acquittal previously by reason of insanity on charges of kidnap and statutory rape," and his subsequent "escape from the hospital up in Michigan in January of 1973."

13. The original notice of intent to claim insanity was filed as Respondent's Exhibit Three at the evidentiary hearing in this Court on May 13, 1982. The document reads, in pertinent part:

[T]he defendant intends to prove the defense of insanity by producing a certified copy of an ORDER OF COMMITMENT TO DEPARTMENT OF MENTAL HEALTH AS NOT GUILTY BY REASON OF INSANITY, filed in the Washtenaw County Circuit Court, State of Michigan, on June 3, 1970, a copy of which is attached hereto and made a part hereof.

Inasmuch as defendant has previously been adjudicated incompetent, he is legally presumed to remain incompetent until adjudicated otherwise.

(typeface in original). The attachment referred to in the notice is a part of Exhibit Three.

Trial Rec. at 735. Alvord testified, as set out above, that he had been "acquitted" "by reasons [sic] of insanity." On cross-examination, the prosecutor quibbled with Alvord's use of the word acquitted: "Isn't that rather not guilty because of your insanity, rather than an acquittal of not guilty?"[14] Trial Rec. at 979. He brought out the fact that Alvord had escaped from the mental hospital before coming to Florida, Trial Rec. at 980, and, when questioning petitioner about a gun he had allegedly sold immediately after the killings, the prosecutor commented on an "[e]scapee from a mental hospital walking around with a gun like that." Trial Rec. at 981.

Mr. Meyers did not request an instruction on the presumption of insanity because he "wasn't able to develop the insanity defense the way it . . . should be developed because of the lack of cooperation with [A]lvord." Meyers Depo at 49. The jury returned verdicts of guilt on all three counts.

### 2. Ineffective Assistance of Counsel.

■■■ The sixth amendment guarantees to criminal defendants the effective assistance of counsel; that is, of an attorney reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Washington v. Strickland,* 693 F.2d 1243, 1250 (5th Cir. Unit B 1982) (en banc); *Washington v. Watkins,* 655 F.2d 1346, 1355 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982); *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir.1974). The standard remains the same whether counsel was retained or appointed. *Cuyler v. Sullivan,* 446 U.S. 335, 344–45, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). In order to succeed on a claim of ineffective assistance of counsel,

a federal habeas petitioner must prove his entitlement to relief by a preponderance of the evidence. *Washington v. Strickland,* 693 F.2d at 1250; *United States v. Killian,* 639 F.2d 206, 210 (5th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981).

■■■ The major ground of petitioner's ineffective assistance claim is Mr. Meyers' failure to investigate and present Alvord's insanity defense. Constitutionally effective counsel must conduct a "reasonable amount of pretrial investigation." *Washington v. Strickland,* 693 F.2d at 1251; *see Washington v. Watkins,* 655 F.2d at 1355–56. The standard governing the amount of pretrial investigation that is reasonable cannot be articulated with precision, for it "necessarily depend[s] upon a variety of factors including the number of issues in the case, the relative complexity of those issues, the strength of the government's case, and the overall strategy of trial counsel." *Washington v. Strickland,* 693 F.2d at 1251; *Washington v. Watkins,* 655 F.2d at 1357. The Fifth Circuit has noted, however, that its admonition against assessing counsel's performance "through the finely ground lenses of 20/20 hindsight" "is especially compelling in reviewing claims . . . grounded in allegations of inadequate investigation and preparation." *Washington v. Watkins,* 655 F.2d at 1356. Instead, the reasonableness of counsel's assistance must be judged " 'from the perspective of counsel, taking into account all the circumstances of the case, but only as those circumstances were known to him at the time in question.' " *Washington v. Strickland,* 693 F.2d at 1251 (quoting *Washington v. Watkins,* 655 F.2d at 1356).

The en banc *Washington v. Strickland* court recently analyzed a failure-to-investigate claim by describing in five paradigms

---

**14.** Mr. Meyers later objected to the prosecutor's quibble and moved for a mistrial:

> I would like to move for a mistrial on the grounds that the prosecution did and was allowed to go into the matter of the defendant's record or finding of not guilty by reason of insanity for the rape and kidnapping up in Michigan. It's my contention that the matter

should have been left there. But the prosecution pressed forward and also got the defendant to try to explain that even though he was acquitted of this, that he was, in fact, guilty of it and subsequently found [sic—not] guilty because of insanity.

Trial Rec. at 1004.

those situations that might underlie such a claim. 693 F.2d at 1252–58. The court began with perhaps the clearest breach of the duty to investigate: cases in which trial counsel perceived only one plausible line of defense for his client, but failed to conduct a substantial investigation thereof. *Id.* at 1252–53. "[P]ermissible trial strategy can never include the failure to conduct a reasonably substantial investigation into a defendant's one plausible line of defense." Id. at 1252; *e.g. Gomez v. Beto,* 462 F.2d 596 (5th Cir.1972).

Against this clear case, the court compared two other paradigms that are relevant to this petition. It focused on the necessary content of a "reasonably substantial investigation" by positing its second class of cases, holding to the now routine conclusion that effective defense counsel " 'is not required to pursue every path until it bears fruit or until all conceivable hope withers.' " 693 F.2d at 1253 (quoting *Lovett v. Florida,* 627 F.2d 706, 708 (5th Cir. 1980)). "Rather, attorneys must conduct a substantial investigation which includes 'an independent examination of the facts, circumstances, pleadings and laws involved.' " *Id.* at 1253 (quoting *Rummel v. Estelle,* 590 F.2d 103, 104 (5th Cir.1979)).

Finally, the court identified the role of trial strategy in cases of this kind by describing as its fourth paradigm cases in which "counsel fail[ed] to conduct a substantial investigation into one plausible line of defense because of his reasonable strategic choice to rely upon another plausible line of defense at trial." *Id.* at 1254. Ideally, an attorney should investigate all possible defenses before choosing to exclude some at trial, but achievement of that ideal is not required by the sixth amendment. "Often, counsel will make a choice of trial strategy relatively early in the representation process after conferring with his client, reviewing the state's evidence, and bringing to bear his experience and professional judgment." *Id.* (footnote omitted). The distance between ideal and constitutional minimum is significant under *Washington v. Strickland,* however: "Whereas a strategy chosen after full investigation is entitled

to almost automatic approval by the courts, a strategy chosen after partial investigation must be scrutinized more closely . . . ." *Id.* at 1255.

This petition presents a difficult variation on the paradigms set out in *Washington v. Strickland.* The facts as trial counsel knew them suggested two possible defenses: the available insanity defense, which Meyers considered Alvord's only real hope, and the unsupported alibi, which Alvord consistently asserted and to which he eventually testified at trial. Primarily because of Alvord's opposition to an insanity defense, counsel went to very little effort to investigate that defense before trial. The major issue underlying Alvord's claim of ineffective assistance, then, is whether and to what extent a criminal defendant's expressed unwillingness to raise a particular defense absolves his attorney of the responsibility to investigate and present that defense.

The record reveals that Mr. Meyers did very little independent investigation of Alvord's potential insanity defense. He obtained only a small portion of his client's voluminous medical record, and made no effort to have even that small part interpreted by a qualified psychiatrist. Meyers Depo. at 29, 42–43. He made no effort to contact anyone in Michigan, where Alvord spent 25 of his 26 years; specifically, he never contacted the doctors who had treated his client at the Ionia State Hospital. *Id.* at 57. After Alvord refused for the first time to speak to the two court-appointed psychiatrists, counsel chose not to be present at the several subsequent examinations, even though he knew that Alvord's uncooperativeness was on the stated ground that his attorney was not present. He also made no effort until a few days before trial to seek reconsideration of the trial court's ex parte December 6, 1973 order vacating the order of commitment. In the absence of an independent investigation, counsel neither explored the helpful facts and opinions to which Dr. Robey might have testified nor brought out the substantial qualifications that the doctor himself placed on his opinion that Alvord was sane at the time of

the offense.[15] In short, Mr. Meyers undertook virtually no investigation of the one defense he considered viable in Alvord's case, choosing instead to comply with Alvord's request that he put petitioner on the stand and proceed with an alibi defense.

■ The question presented in this claim, as framed by the court in *Washington v. Strickland,* is whether trial counsel made a reasonable choice based upon reasonable assumptions when he rejected the uninvestigated insanity defense in favor of Alvord's alibi:

> The choice by defense counsel to rely upon certain lines of defense to the exclusion of others before investigating all such lines is a strategic choice.
>
> . . . .
>
> A strategy chosen without the benefit of a reasonably substantial investigation into all plausible lines of defense is generally based upon counsel's professional assumptions regarding the prospects for success offered by the various lines. The cases generally conform to a workable and sensible rule: when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial.

693 F.2d at 1254–55 (citations and footnotes omitted). To resolve that question, the Court must briefly review the strength of the state's case and of the alternative defenses and must consider the impact of Alvord's refusal to proceed with an insanity defense upon his attorney's exercise of professional judgment.

The state presented a strong case that petitioner had committed the acts of which he was charged. Zelma Hurley, Alvord's girlfriend, testified that he had confessed committing the crimes to her the morning after they allegedly took place. Trial Rec. at 753–54. The prosecution also introduced testimony concerning certain items—a cigarette lighter, jewelry, a watch, and some cash—allegedly stolen from the victims. Hurley testified that Alvord had some of these items just after the killings took place, Trial Rec. at 750, 757–59, and Terri Williams, another friend of Alvord, stated she saw them in his possession in Detroit about one week after the crimes occurred. Trial Rec. at 879–82. The items were apparently never found. Trial Rec. at 853 (testimony of Detective John W. Reed). Other circumstantial evidence was introduced further tying Alvord to the crime scene. Finally, as described above, the state introduced a statement made by petitioner upon his arrest in Michigan for theft to the effect that he was not a thief, he was a rapist. Trial Rec. at 922. *See* section IV, *infra.*

Against this strong case, Alvord's sole defense was an uncorroborated alibi. He took the stand and testified that from nine to midnight on the night of the killings he was with Zelma Hurley at the home of one Joe Duncan, that they left around midnight and spent the next hour to hour and a half at a bar, the Sportsman's Lounge, and that they returned to their apartment about 1:15 a.m. Alvord stated that he had seen a friend, Jeanine Brautigan, at the lounge that night, but she did not testify. After dropping Hurley off at the apartment, Alvord assertedly went to the Davis Island Hotel to find a friend. Unable to locate the friend, he spent another hour to hour and a

**15.** As developed since trial, Dr. Robey could have disclosed substantial qualifications on his opinion of Alvord's sanity, had he been asked, indeed, Dr. Robey's deposition is replete with qualifications and reservations. He testified that his opinion was rendered without adequate information; he knew next to nothing of the details of the crime or of Alvord's relationship to the victims. Robey Depo. at 56–58. He stated that the circumstances in which he examined Alvord in January 1974 were inadequate to support a firm opinion, and that defense counsel never spoke to him in substance about his opinion. *Id.* He also indicated that Alvord's post-arrest statement was unknown to him when he rendered his opinions, but that such would have been important. *Id.* at 63–64. In short, Dr. Robey's "opinions were weaker than [he] wanted them to be." *Id.* at 58.

half at a bar adjoining the hotel and returned home, where he passed out in the car until daybreak. He also stated that he had consumed a substantial quantity of beer and had smoked a certain amount of marijuana during the course of the evening. No other witness testified in support of this alibi defense.

The alternative defense, of course, was that of insanity. Had he chosen to do so, Mr. Meyers could easily have raised the presumption of incompetence and insanity available to Alvord by virtue of his prior adjudication in Michigan.[16] *See Parkin v. State,* 238 So.2d 817 (Fla.1970); *Horace v. Culver,* 111 So.2d 670 (Fla.1959); *Wells v. State,* 98 So.2d 795 (Fla.1957); *Livingston v. State,* 383 So.2d 947 (Fla.App.1980); *Hixon v. State,* 165 So.2d 436 (Fla.App.1964). The state would thereby have been put to the burden of proving beyond a reasonable doubt that Alvord was sane at the time of the offense.[17] *Horace v. Culver; Parkin v. State.* The apparent importance of this presumption is diminished somewhat by the fact that one who has never been adjudicated insane need only produce evidence raising a "reasonable doubt as to sanity" in order to put the state to its burden of proving sanity beyond a reasonable doubt.

**16.** Respondent argues without citation that a foreign adjudication cannot raise the presumption of insanity in a Florida court, especially if the foreign adjudication was based upon a standard for determining insanity different from that applied in Florida. *But see Hixon v. State,* 165 So.2d 436 (Fla.App.1964). This issue was never squarely faced in the original trial. *See also* note 5, *supra.*

**17.** The presumption raised by Alvord's prior adjudication applied not only to the determination of competency to stand trial, but to petitioner's sanity at the time of the offense as well. In *Hixon,* the defendant had been adjudicated insane in Ohio in 1958. He escaped and fled to Florida, where he murdered his former wife. Upon motion for a sanity hearing, Hixon was transferred to the Florida State Hospital for examination by court-appointed doctors. The court adjudicated him incompetent to stand trial on the basis of the doctors' reports, and Hixon was treated for three years at the state hospital. Thereafter, Hixon was found "sane enough" to stand trial, and was convicted. The District Court of Appeal reversed that conviction, however, holding that the presumption of insanity at the time of the offense was

*See Byrd v. State,* 297 So.2d 22 (Fla.1974). By affording defendants the presumption of insanity, Florida has simply provided an easy avenue by which those who have been adjudicated insane might raise the "reasonable doubt as to sanity" that ordinarily puts the prosecutor to his heavy burden of proof on the issue.

■ Resolution of Alvord's ineffective assistance claim necessarily involves consideration of Mr. Meyers' reasons for choosing not to assert the largely uninvestigated insanity defense. *Washington v. Strickland,* 693 F.2d at 1254–55. Counsel testified both before this Court and in his deposition that his major reason was Alvord's unwillingness to raise the defense or cooperate in its preparation and presentation. This is not a case in which the accused was willing to assert the defense, but was of little help in its preparation. In *Davis v. Alabama,* 596 F.2d 1214 (5th Cir.1979), *vacated as moot,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980),[18] the court chided the state of Alabama for attempting to exonerate Davis' attorneys by suggesting that Davis "might have given them more leads, more evidence of his insanity ...." 596 F.2d at 1219. "[A] defendant's failure to disclose certain

never overcome by the state. Thus, neither the fact that the prior adjudication was from another state nor the trial court's finding that Hixon was competent to stand trial dissolved the state law presumption that Hixon was insane at the time of the offense.

**18.** *Davis* was vacated as moot by the Supreme Court. *Alabama v. Davis,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). Justice Powell has warned that even after such an action by the Court, the appellate decision in question is "likely to be viewed as persuasive authority if not the governing law" of the circuit. *County of Los Angeles v. Davis,* 440 U.S. 625, 646 n. 10, 99 S.Ct. 1379, 1391 n. 10, 59 L.Ed.2d 642 (1979) (dissenting). Nevertheless, the Fifth Circuit developed the general requirement that defense counsel conduct an independent investigation in cases dating back to 1970, *e.g. Clark v. Blackburn,* 619 F.2d 431, 432 (5th Cir.1980); *Caraway v. Beto,* 421 F.2d 636 (5th Cir.1970), and continues to cite and rely upon the *Davis* decision. *See Beavers v. Balkcom,* 636 F.2d 114 (5th Cir.1981).

information to his attorney is not necessarily, or obviously, or even probably the defendant's fault." *Id.* Alvord was much more than simply reticent in his statements to Mr. Meyers; in the face of the contrary advice of counsel, petitioner stated repeatedly that he was unwilling to assert the defense of insanity at all. The wishes of a client on a matter of this kind cannot be disregarded by defense counsel. In deciding among various defenses, an attorney must be mindful of his client's willingness to proceed on a particular theory, for he may reasonably assume at the very least that the lack of cooperation from an unwilling client would doom the defense—he may also reach the more weighty conclusion that the decision whether to plead insanity is for the accused, not his attorney. *See* American Bar Association, Code of Professional Responsibility EC 7–7, 7–8 (1969); American Bar Association, Project on Standards for Criminal Justice, Standards Relating to the Defense Function § 5.2 (App. Draft 1971). To say that defense counsel may at least consider his client's wishes in deciding whether to enter a plea of insanity is not to say that the attorney may lightly reject a potential defense of insanity, raising as it does the possibility that the accused's decision-making faculties may be clouded. *See Davis,* 596 F.2d at 1220.[19] The sixth amendment requires that defense counsel do more than simply obey the possibly pathological wishes of an accused; counsel must, however, take those wishes into account when deciding whether to raise the insanity defense.

A second consideration was the damning opinion of Dr. Robey that petitioner was sane at the time of the offense. Although he might have discovered qualifications on that opinion upon inquiry, Mr. Meyers was not unreasonable in assuming that this opinion, rendered by the psychiatrist who knew Alvord best, would effectively undermine an insanity defense.

Other of Mr. Meyers' concerns may have been more perceived than real. Like the Federal Rules, Florida's Rules of Criminal Procedure did and do require that a defendant who intends to raise the defense of insanity file notice of that intent; in the absence of such a notice, a defendant may not introduce evidence of his insanity. Fla. R.Cr.P. 3.210(e) (now at Fla.R.Crim.P. 3.216(b)); *see* Fed.R.Cr.P. 12.2. But the Florida rule did permit exceptions for good cause shown. Fla.R.Cr.P. 3.210(e) (altered version currently in force, Fla.R.Cr.P. 3.216(f)). *Parkin v. State,* 238 So.2d 817 (Fla.1970), was also not necessarily an insurmountable obstacle. *Parkin* held that a defendant who raises an insanity defense must cooperate with doctors for the prosecution or the court, reasoning that such a defendant ought not be able to refuse to meet with all but his own doctors. But Alvord did cooperate with Dr. Robey, who was sent for by the state and was its key witness at the sentencing hearing, and with Dr. Sprehe—at least long enough on two occasions for that doctor to advance the opinion that Alvord was competent to stand trial.

Petitioner does not contend that his attorney failed to advise him to raise the insanity defense and to cooperate more fully with the court-appointed psychiatrists. *Cf. Brennan v. Blankenship,* 472 F.Supp. 149 (W.D.Va.1979). To the contrary, the record reveals that counsel repeatedly so advised his client. Mr. Meyers could have, and probably should have, done more to investigate the insanity defense of his obviously unstable defendant. But the sixth amendment was not offended when counsel, knowing the essential facts underlying the insanity defense and aware of Dr. Robey's damaging opinion, acceded to his client's stated and adamant objections to asserting

---

**19.** Mr. Meyers assumed that Alvord's decision not to assert his insanity defense was based on the fact that "he didn't want to go back to institutions." Meyers Depo. at 42. Dr. Robey testified, on the other hand, that petitioner's refusal to raise the defense was rooted in fears that he would be considered mentally ill, "particularly because of the identification with his mother's mental illness." Robey Depo. at 43. The doctor did nevertheless opine that Alvord was competent to stand trial. *See* Trial Rec. at 148–51.

that defense. Ethical considerations aside, his assumptions that success on an insanity theory would have been impossible without Alvord's cooperation was reasonable under the circumstances, and cannot now be second-guessed.

Having found other aspects of petitioner's claim of ineffective assistance of counsel to be without merit, this Court concludes that Alvord received constitutionally adequate assistance of counsel before and at trial.

### B. *Representation at Sentencing.*

#### 1. *The Sentencing Hearing.*

Petitioner also claims that trial counsel failed to provide constitutionally effective assistance at the sentencing phase. Alvord's sentencing was conducted during the evening of April 4, 1974, the same day the jury returned its verdict of guilt. The state called Dr. Robey. Although Mr. Meyers called no witnesses, he testified before this Court that he had planned to call Dr. Robey had the state not done so, for counsel knew that the doctor would testify to two statutory mitigating factors.

After stating his professional qualifications and the general circumstances in which he had come to know Alvord, Dr. Robey testified to certain details of the 1967 Michigan kidnapping and statutory rape of which Alvord was charged. Trial Rec. at 1153–55.[20] He stated that Alvord had been tried to a judge and found not guilty by reason of insanity on the basis of another psychiatrist's testimony that Alvord did not know right from wrong. Dr. Robey's view of Alvord's condition at the time of the Michigan crime was somewhat different, however; he stated at the sentencing hearing in this case that he considered Alvord to have known right from wrong at the time of the Michigan crimes, but to have been acting under irresistible impulse—the second prong of Michigan's insanity standard.[21] The doctor went on to

recount Alvord's committment to Ionia State Hospital and his two subsequent escapes. He also described two minor offenses of which Alvord had been convicted.[22] Dr. Robey next described his examinations of Alvord in early 1974, and recited again his opinions that Alvord was competent to stand trial and that he knew right from wrong at the time of the Florida crimes. After explaining Alvord's mental illness in psychological terms, the witness then testified to two mitigating factors: he stated his opinion that Alvord had been "under a great deal of emotional stress" at the time of the offenses, Fla.Stat. § 921.-141(6)(b) (1973), and that his capacity to conform his behavior to the requirements of law was "clearly impaired," *id.* § 921, 141(6)(f). *See* Trial Rec. at 1178. His direct testimony concluded with his statement that Alvord was dangerous to women.

On cross-examination by Mr. Meyers, Dr. Robey described in fair detail the history of Alvord's mental illness, extending back to the age of thirteen. He stated that Alvord was married and had a child age six. He reiterated his view that Alvord had been under great emotional stress and that he lacked capacity to conform his conduct to the requirements of law. He then stated in quite compelling terms his belief that Alvord's mental illness was not such as to prevent rehabilitation.

After closing arguments, the jury returned an advisory verdict recommending the death penalty, and on April 9, 1974, the trial judge sentenced Alvord to death and entered findings in support of that sentence as required by section 921.141(3), Fla.Stat.

#### 2. *Ineffective Assistance of Counsel.*

Petitioner contends that counsel rendered ineffective assistance at the penalty phase because: first, he failed to collect and present in mitigation Alvord's extensive medical record indicating his history of mental illness; second, he failed to cross-ex-

---

**20.** Mr. Meyers' hearsay objection was overruled. Trial Rec. at 1152–53.

**21.** See note 5, *supra.*

**22.** The parties later agreed that each of these were misdemeanor convictions. Trial Rec. at 1197–98.

amine Dr. Robey effectively due to his general lack of familiarity with Alvord's psychiatric history; third, he failed to produce as "rebuttal witnesses" other doctors, including Alvord's treating psychiatrists in Michigan; and fourth, he failed to produce character witnesses to humanize Alvord in the eyes of judge and jury.

 One accused of capital crime has a sixth amendment right to effective assistance of counsel at the penalty phase, as well as during certain pretrial proceedings and at the trial itself. *See Stanley v. Zant*, 697 F.2d 955 (11th Cir.1983); *Washington v. Strickland; Proffitt v. Wainwright*, 685 F.2d 1227, 1245 (11th Cir.1982); *Davis v. Alabama*, 596 F.2d at 1217. Essentially the same standard applies when assessing counsel's performance at the sentencing hearing as applies in gauging his effectiveness at trial, that of "reasonably effective assistance." *Proffitt*, 685 F.2d at 1245. The Constitution does not require errorless counsel, and although its requirements are theoretically no more strict in capital cases than in other criminal cases, " 'the seriousness of the charges against the defendant is a factor that must be considered in assessing counsel's performance.' " *Stanley*, at 962 (quoting *Proffitt*, 685 F.2d at 1287).

 Upon detailed review of the record, this Court concludes that the adequacy of counsel's performance at and in preparation for the sentencing hearing may have fallen below constitutional requirements. His almost total failure to investigate the facts supporting mitigating circumstances simply cannot be overlooked.

. First, as was true in connection with his investigation of the insanity defense, Mr. Meyers failed to seek out and interview Alvord's treating psychiatrists in Michigan. He made no effort to obtain Alvord's complete medical history, nor did he retain an independent psychiatrist to review the small portion of the medical record that he did have. It may well be repeated that counsel never chose to appear with one of the court-appointed psychiatrists at one of their attempted examinations of Alvord, even though he knew that Alvord's stated objection to being examined was that his attorney was not present. Largely these same failings in Mr. Meyers' investigation were considered in assessing his performance in preparation for and during the trial. Specifically, this Court concluded that counsel's failure to investigate matters relating to the insanity defense did not render his representation of petitioner constitutionally ineffective in light of Alvord's absolute unwillingness to pursue that defense. That element is absent with regard to the sentencing phase, however. Indeed, respondent has suggested no assumption to the Court, reasonable or otherwise, that might explain counsel's failure to investigate Alvord's medical history for the purposes of the sentencing hearing. Mr. Meyers' tactic was to rely on those mitigating factors that relate to the mental condition of the accused at the time of the offense, but he made no effort to obtain or present any facts relating to those mitigating circumstances other than the conclusions of Dr. Robey brought out on direct examination and accentuated on cross.

 Second, counsel made no effort to contact or interview anyone who might have testified as a character witness in Alvord's behalf. *Cf. Proffitt*, 685 F.2d at 1247–48. The Eleventh Circuit has now rejected the argument that counsel acts under an absolute duty to investigate and present mitigating character evidence in every capital case. *See Stanley*, at 958–62. Indeed, the *Stanley* court noted that to the date of that decision no panel of the Fifth or Eleventh Circuits had found ineffective assistance on the basis of defense counsel's failure to produce character witnesses at the penalty phase. *Id.*, slip op. at 1486. Mr. Meyers explained his failure to introduce character witnesses as the result of Alvord's "lack of communication" with his family. An attorney's responsibility to make an independent investigation is not discharged by his client's lack of communication with potential witnesses, *see Davis*, 596 F.2d at 1219, but this fact may reasonably lead counsel to assume that petitioner's family might not prove fertile ground in

which to search for character witnesses. Moreover, reliance on general character witnesses may have proved somewhat inconsistent with counsel's chosen tactic to rely on petitioner's psychiatric condition in mitigation of sentence. *See Stanley,* at 966–70. The Supreme Court has emphasized in a recent line of cases the importance at the penalty phase of character evidence and evidence of any personal circumstance that might lead the sentencer to be merciful. *E.g. Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). *See Songer v. State,* 365 So.2d 696, 700 (Fla.1978), *cert. denied,* 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979). Such evidence is often critical to balance the inevitable impression of an accused's character left upon his conviction for murder. Although it is patently insufficient to explain counsel's inadequate investigation of Alvord's psychiatric history, Mr. Meyers' tactical choice to rely on the mitigating factors relating to the accused's mental condition may justify his failure to do more than he did in the way of investigating possible character witnesses.

The Court is prepared to conclude that counsel rendered constitutionally deficient representation by failing to undertake a reasonable investigation into Alvord's psychiatric history. It need not formally so conclude, however, for petitioner has shown no prejudice arising from any of the aspect's of Mr. Meyers' performance that were assertedly ineffective.

### 3. *Prejudice.*

 Petitioner has offered the testimony of no independent psychiatrist available at the time who might have testified more favorably than Dr. Robey at sentencing.[23] A federal habeas petitioner must demonstrate his entitlement to relief by a preponderance of the evidence. *Washington v. Strickland,* 693 F.2d at 1250. Indeed, the major appellate decisions dealing with the necessary performance of counsel at sentencing have been predicated upon petitioner's introduction of evidence that might have been brought out upon adequate investigation. *E.g. Stanley; Washington v. Strickland. See Washington v. Watkins,* 655 F.2d at 1363. Petitioner herein has simply not offered any evidence of psychiatric testimony that might have been revealed upon a more thorough investigation. Furthermore, although independent experts might have disagreed with Dr. Robey's view that Alvord was sane at the time of the offenses, they could have added nothing to Dr. Robey's testimony at sentencing, for that testimony fully supported Alvord's position with regard to both of the mitigating factors that focus on mental condition. Fla.Stat. §§ 921.141(6)(b), .121(6)(f). The sentencing judge found these factors to have been established in this case. Trial Rec. at 97. Accordingly, even assuming that helpful testimony of independent experts might have been available, Mr. Meyers' failure to investigate and present it did not result in "actual and substantial disadvantage" to petitioner in the course of the sentencing hearing. *Washington v. Strickland,* 693 F.2d at 1262.

Similarly, the Court finds no prejudice arising from Mr. Meyers' failure to identify and produce character witnesses; again, petitioner has not indicated to this Court any such testimony that might have been revealed upon adequate investigation. Accordingly, this Court concludes that counsel's failure to investigate possible character witnesses did not work to petitioner's "actual and substantial disadvantage." *Id.*

Petitioner having suffered no legally cognizable prejudice, this Court concludes that his claim of ineffective assistance of counsel at the sentencing hearing is without merit.

### C. *Representation on Appeal.*

Petitioner's second ground for relief is that he was denied effective assistance of

---

**23.** Petitioner did file the deposition of Dr. Francis Walls, a psychiatrist with the Florida State Prison System who came into contact with Alvord after his conviction. Dr. Walls did not testify at the evidentiary hearing. This Court has nevertheless read and considered Dr. Walls' deposition testimony.

counsel on his direct appeal to the Florida Supreme Court.[24] Specifically, petitioner contends that appellate counsel, Richard Seymour, Esquire,[25] provided constitutionally deficient representation because he failed to raise five "significant issues which should have been brought to the reviewing court's attention." These issues were whether the trial court erred: first, by not "responding to petitioner's pro se plea to remove the public defender" as his attorney; second, by not instructing the jury sua sponte on the presumption of insanity; third, by setting aside its November 2, 1973 order committing petitioner for psychiatric examination; fourth, by allowing Dr. Robey to testify to Alvord's competency and sanity based on an examination made without notice to defense counsel and in violation of Alvord's fifth amendment privilege; and fifth, by allowing the doctor to testify at the sentencing hearing to certain prior crimes of which Alvord was not convicted and which were otherwise excludable. Although it may be unnecessary, each of these several contentions will be discussed in turn.

### 1. *The Standard.*

The level of effectiveness constitutionally required of appellate counsel has been considered far less frequently than has that of trial counsel. The Supreme Court has stated in a slightly different context, however, that counsel on appeal must take "the role of an active advocate in behalf of his client." *Anders v. California,* 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967). Various courts of appeal, including those for the Fifth and Eleventh Circuits, have applied an analysis substantially similar to that applied in claims of ineffective assistance at trial. *E.g. Mylar v. Alabama,*

671 F.2d 1299 (11th Cir.1982); *Mendiola v. Estelle,* 635 F.2d 487 (5th Cir.1981). See *Cuyler v. Sullivan,* 446 U.S. 335, 344–45, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). Typically, claims of ineffective assistance on appeal turn on counsel's complete failure to file or prosecute the appeal, *e.g. Sullivan v. Wainwright,* 695 F.2d 1306, 1309 (11th Cir.1983); *Mack v. Smith,* 659 F.2d 23 (5th Cir.1981); *Chapman v. United States,* 469 F.2d 634 (5th Cir.1972); *see Perez v. Wainwright,* 640 F.2d 596 (5th Cir.1981), and appellate counsel ordinarily need not assert, on a properly perfected appeal, grounds that he reasonably considers meritless. *Mendiola; Hooks v. Roberts,* 480 F.2d 1196 (5th Cir.1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); *see Mylar,* 671 F.2d at 1300–01 (appellate counsel must render " 'reasonably effective performance.' ") (quoting *United States v. Phillips,* 664 F.2d 971, 1040 (5th Cir.1981)). This Court will therefore proceed to assess whether Mr. Seymour's advocacy fell below the standard of reasonably effective assistance when he failed to raise the various legal arguments listed by petitioner.

### 2. *The Public Defender.*

The first ground proposed by petitioner for finding ineffective assistance on appeal is easily disposed of: Alvord contends that appellate counsel should have raised the trial court's failure to remove the public defender as defense counsel. The state collateral review court found as a matter of historical fact that Alvord "ultimately consented to being represented by Assistant Public Defender Thomas Meyers ...." Rule 3.850 Order at 2. *See also Alvord v. State,* 396 So.2d at 188. This

---

**24.** Petitioner raised this claim on state collateral review, relying on most of the grounds asserted before this Court. He has therefore satisfied the requirement of exhaustion of state remedies. 28 U.S.C. § 2254(b). The conclusion of the state court in denying this claim does not warrant section 2254(d)'s presumption of correctness, for the constitutional effectiveness of appellate counsel, like that of trial counsel, presents a mixed question of law and .fact. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982).

**25.** It appears from Mr. Seymour's deposition and his testimony before this Court that his "assignment" to handle Alvord's appeal came about under unusual circumstances. Seymour Depo. at 6–8, 11, 37–41. Upon due consideration, the Court does not consider these circumstances to affect the ineffective assistance analysis; it is clear, however, that Mr. Seymour acted as appointed counsel.

finding is fairly supported by the record, 28 U.S.C. § 2254(d)(8), which was certainly strong enough on this point to have lead reasonable counsel to decide not to raise the issue on appeal. *See United States v. Young,* 482 F.2d 993 (5th Cir.1973).

### 3. *Sua Sponte Insanity Instruction.*

■ Petitioner also contends that appellate counsel was ineffective because he did not raise the trial court's failure to instruct sua sponte on the continued presumption of insanity. The simple answer to this contention is that trial counsel, not the trial court, bears responsibility to raise defenses and to request instructions in accordance therewith. In a typical case, the trial judge cannot and should not be saddled with the duty to second-guess counsel's tactical choice of defenses and to instruct sua sponte on defenses that might have been raised.

■ Petitioner cites *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), to the contrary. *Winship* held that due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 364, 90 S.Ct. at 1073. In the line of cases of which this aspect of *Winship* is part, the Supreme Court has articulated the circumstances in which due process is violated by placing upon a criminal defendant the burden of proving a particular fact. *E.g. Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (no violation in defendant's burden to prove affirmative defense of "extreme emotional disturbance"); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (due process violated in requiring defendant to prove heat of passion to rebut presumption of murder); *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (no violation of defendant's burden to prove insanity beyond a reasonable doubt).[26] *See also Mason v. Balkcom,* 669 F.2d 222 (5th Cir. Unit B 1982) (violation in presuming intent to kill). No matter how a state designs its presumptions on the issue, insanity remains an affirmative defense unless the sanity of the accused is expressly defined as part of the crime charged. *Leland; see Walker v. Butterworth,* 599 F.2d 1074 (1st Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979); *United States v. Greene,* 489 F.2d 1145 (D.C.Cir. 1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974). Florida's statute does not require proof of a defendant's sanity as an element of first degree murder, Fla.Stat. § 782.04(1)(a), and petitioner's appeal to due process principles in this regard therefore fails.[27] The trial court had neither procedural nor constitutional responsibility to raise the defense on his own.[28] This was precisely the reason Mr. Seymour did not raise the issue, Seymour Depo. at

---

**26.** Although its continued vitality has been questioned in light of *Winship, see* W. LaFave & A. Scott, Criminal Law § 8 at 48 (1972), *Leland* remains good law. *See Rivera v. Delaware,* 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160 (1976) (cited in *Patterson* ).

**27.** This Court need not consider the extent to which due process requires the trial judge to instruct sua sponte on each element of the offense.

**28.** Petitioner cites *Wider v. United States,* 348 F.2d 358 (D.C.Cir.1965), but *Wider* involved the trial court's ongoing obligation to raise and determine the accused's competency to stand trial. This Opinion should not be read to suggest otherwise, but competency to stand trial is an issue distinct from the substantive defense of insanity. A trial court must always consider the competency of a defendant to stand trial,

*see Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); it need not raise sua sponte any substantive defenses that the defendant does not assert.

Cases such as *Byrd v. State,* 297 So.2d 22 (Fla.1974), simply require an insanity instruction when the defense is asserted and the defendant introduces evidence thereon sufficient to raise a reasonable doubt as to his sanity. They do not require the trial court to raise the defense itself—that is up to the defendant and his attorney. *Johnson v. State,* 118 So.2d 234 (Fla.App.1964), is also not to the contrary. That decision simply states the self-evident requirement that the trial court instruct correctly on the presumption of insanity; it cannot be read to obligate the judge to raise Alvord's defense for him.

35, and he certainly cannot be faulted for that decision.

### 4. *Refusal to Commit for Observation.*

■ Petitioner next contends that appellate counsel provided ineffective assistance by failing to raise the trial court's error in setting aside its November 2, 1973 order committing Alvord to the state mental hospital for observation. The trial judge set aside his commitment order because, apparently after consulting with state agency officials, he became convinced that he was without authority to commit Alvord under the circumstances. Petitioner argues that the trial judge had that authority under Rule 3.210, Fla.R.Crim.P., that he erred in not exercising it, and that appellate counsel should have cited that error on appeal. Respondent contends that Rule 3.210 does not grant the authority to commit for determination of sanity, and that appellate counsel was prevented from raising the issue before the Florida Supreme Court by such cases as *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Respondent misunderstands the Supreme Court's holding in the three cases cited to this Court, *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Wainwright v. Sykes. Wainwright* and *Engle* hold that a state habeas petitioner may not obtain federal collateral relief based on trial errors to which no required contemporaneous objection was made unless he can make the now familiar showing of cause and prejudice. *Frady* applied that principle to a movant under 28 U.S.C. § 2255. Whether Mr. Seymour could have raised this alleged error of the trial court on appeal before the Florida Supreme Court is entirely a question of state law.

The Florida Supreme Court, like most other appellate courts, adheres to the principle that it should not reach issues which the trial court did not have a "full and adequate opportunity to consider." *In re Beverly,* 342 So.2d 481, 489 (Fla.1977); *see Dober v. Worrell,* 401 So.2d 1322 (Fla.1981);

*Silver v. State,* 188 So.2d 300, 301 (Fla. 1966). This contemporaneous objection rule is grounded in the familiar purpose of giving the trial court an opportunity to consider the issue in question. *See Corbett v. Dade County Board of Public Instruction,* 372 So.2d 971, 974–75 n. 3 (Fla.App.1979). In this case, however, the trial judge had ample "opportunity to consider" the commitment issue. Indeed, he considered it once in November 1973, when he committed Alvord, and again in December when he vacated the commitment order. Moreover, on March 26, 1974, Mr. Meyers moved, albeit belatedly, to transfer Alvord to a state hospital. It is clear, however, that Mr. Seymour considered this issue to be only arguably preserved for appellate review. In reaching this conclusion, counsel was under the mistaken impression that Mr. Meyers had never moved to have Alvord committed. Seymour Depo. at 31–33; *see* Trial Rec. at 74 (Motion to Transfer Defendant to State Mental Hospital for Observation to Determine Sanity).

The law was notably unclear in 1973 and 1974 on the obligation—not to mention authority—of a Florida judge to order a criminal defendant committed for observation to determine his competency to stand trial or insanity at the time of the offense. The prevailing procedures at that time were in Rule 3.210, Fla.R.Crim.P., headed "Insanity." Subsection (a) dealt with what has come to be known as competence to stand trial. It provided that when, upon its or the defendant's motion, the trial court develops "reasonable ground to believe" that the defendant is incompetent, it must "immediately fix a time for a hearing to determine the defendant's mental condition." *See Fowler v. State,* 255 So.2d 513 (Fla. 1971) (construing essentially identical predecessor to quoted section). In order to determine whether a defendant is competent to stand trial, the court was authorized to appoint up to three psychiatric experts to examine him and testify. If necessary, "the court may order the defendant taken into custody until the determination of his sanity [i.e. competence] can be made." Fla. R.Crim.P. 3.210(d). *See Lederer v. Stack,*

294 So.2d 107 (Fla. 4th DCA 1974) (court must "fix a time" for competency hearing before defendant may be incarcerated under subsection).[29] If the defendant is found competent he proceeds to trial; if he is found incompetent, he is then committed "to the Division of Mental Health for hospitalization under the provisions of Fla.Stat. § 394.467, F.S.A.," subject to continuing review. Fla.R.Crim.P. 3.210(a)(3); *see Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). The rule did not contain specific provision for commitment as a first step in determining competence to stand trial, nor did it expressly allow commitment to enable psychiatric examination of an accused's mental state at the time of the crime. *See* Fla.R.Crim.P. 3.210(c).

■ Petitioner argues that the trial court was nevertheless constitutionally compelled to commit him for observation. One prong of this contention is that commitment was required in order to make a constitutionally adequate determination of Alvord's competency to stand trial. Years ago the Supreme Court settled the proposition that due process is violated by conviction of an accused while he is legally incompetent to stand trial. *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956).[30] A decade later, the Court safeguarded that due process guarantee by a separate procedural due process right to a competency hearing whenever the facts or events before the trial court raise a "bona fide doubt" as to the defendant's competency to stand trial. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *see Acosta v. Turner,* 666 F.2d 949 (5th Cir. Unit B 1982). Several hearings were held in this case to determine petitioner's competence to stand trial, and this Court cannot say that the procedures undertaken by the trial court were insuffi-

cient under *Pate. See Reese v. Wainwright,* 600 F.2d 1085, 1090–92 (5th Cir.), *cert. denied,* 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979); *Greenfield v. Gunn,* 556 F.2d 935 (9th Cir.), *cert. denied,* 434 U.S. 928, 98 S.Ct. 413, 54 L.Ed.2d 288 (1977). The trial court was therefore not required by *Pate* to commit Alvord for observation.

The second prong of petitioner's constitutional argument is that commitment was required because it afforded "the best opportunity to determine the viability of an insanity defense." Petitioner's Memorandum, March 10, 1982, at 30. Two court-appointed psychiatrists tried several times to examine Alvord, but he refused each time on the stated ground that his lawyer was not present. Dr. Robey, an expert brought to Florida by the state and subsequently requested by the court to examine Alvord to determine sanity, succeeded in talking to Alvord for some two hours and concluded, although qualifiedly, that petitioner was sane under Florida's M'Naghten standard at the time of the offense. This Court can find no constitutional violation in the extent of expert psychiatric assistance provided by the state in this case. *See United States ex rel. Smith v. Baldi,* 344 U.S. 561, 568, 73 S.Ct. 391, 395, 97 L.Ed. 549 (1953); *Payne v. Thompson,* 622 F.2d 254, 255 (6th Cir.1980); *cf. United States v. Taylor,* 437 F.2d 371, 383–84 n. 6 (4th Cir.1971) (Sobeloff, J., concurring and dissenting). *See* Section II, *infra.*

Thus, appellate counsel faced an issue only arguably preserved for appeal and of dubious legal merit. His decision not to raise such an issue cannot ground a finding of ineffective assistance. *Mendiola.*

### 5. The "Estelle v. Smith" Issue.

■ Petitioner's next asserted ground for finding appellate counsel ineffective is

---

**29.** The quoted provision for detaining a defendant is intended as an exception to Florida's bail requirements; it is not authority for the commitment order petitioner contends the trial court was empowered to issue. *See* Author's Comment to Rule 3.210, *reprinted in,* Fla.R. Cr.P. 3.210, 33 Fla.Stat.Ann. (1975).

**30.** One is legally incompetent to stand trial when he lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as a factual understanding of the proceeding against him." *Dusky v. United States,* 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

his failure to argue on appeal the trial court's error in allowing Dr. Robey to testify at the sentencing hearing as to Alvord's mental condition on the basis of an examination made without notice to defense counsel and in violation of petitioner's fifth and fourteenth amendment privilege.[31] The Supreme Court held in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), that introduction of a court-appointed psychiatrist's testimony to prove a capital defendant's future dangerousness, based on information gleaned from a custodial examination of the accused who neither requested the examination nor introduced psychiatric evidence on the issue and who was not warned of his right to remain silent and that any statement he made could be used against him at sentencing, violated the rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Smith* court also held that the accused's sixth amendment right to counsel was infringed because defense counsel was given no notice of the psychiatric examination. Finally, the *Smith* decision is to be retroactively applied. *Battie v. Estelle,* 655 F.2d 692 (5th Cir.1981).[32]

Because the *Smith* issue arises in the posture of an ineffective assistance claim, this Court must decide whether counsel is to be charged with anticipating *Smith*'s holding some six or seven years before the decision was rendered. *See Proffitt v. Wainwright,* 685 F.2d at 1248. The question is close. The opinion in *Battie* includes the familiar retroactivity analysis, and contains the Fifth Circuit's conclusion that "*Smith* did not establish a new principle of constitutional law because that decision merely applied already fixed principles to a new factual situation." *Id.* at 699. On the other hand, the Fifth Circuit declined to

"fault" counsel for not anticipating the court of appeals' decision in *Smith,* 602 F.2d 694, and therefore found effective assistance of counsel in *Gray v. Lucas,* 677 F.2d 1086, 1096 n. 9 (5th Cir.1982). *See also Sullivan,* 695 F.2d at 1309. Moreover, Mr. Seymour faced the then-recent decision in *Parkin v. State,* 238 So.2d 817 (Fla.1970), a case that could easily lead reasonable counsel to conclude that the Florida Supreme Court would not favorably receive a *Miranda* and sixth amendment attack on Dr. Robey's first examination of Alvord.

Several aspects of this case also indicate that Mr. Seymour cannot be faulted for not raising a *Smith* point on appeal. First, trial counsel failed to object to Dr. Robey's arguably *Smith*-violative testimony that petitioner would be dangerous to women in the future and that he was sane at the time of the Florida crimes. Trial Rec. at 1171–72, 1178–79.[33] Second, and more fundamentally, the *Smith* issue would not necessarily have succeeded on appeal. In *Smith* the psychiatrist who examined the accused, Dr. Grigson, testified on the basis of that examination alone. Thus, there was no question that his conclusions on future dangerousness were based on statements made during a custodial examination without prior *Miranda* warnings or notice to counsel. Mr. Seymour faced quite a different circumstance: Dr. Robey had supervised Alvord's treatment for years prior to his escape in Michigan, and his contemporaneous examination of Alvord was in two sessions, the latter of which—on the specific question of petitioner's sanity at the time of the offense—was apparently in substantial compliance with the dictates in *Smith.* His testimony was therefore not based entirely, and may not have been based at all, on the first custodial examination.[34] Finally, the

**31.** In discussing this asserted failing of appellate counsel, the Court will limit itself to counsel's failure to raise the *Miranda* violation. The next subsection of this Opinion involves Mr. Seymour's failure to attack on appeal the admission of certain factual information through Dr. Robey. *See* section IV, *infra,* on the substantive *Miranda* attack.

**32.** Petitioner does not assert *Smith* as an independent ground for granting habeas relief in this case.

**33.** Mr. Meyers did object to the lack of notice at the January 4, 1974 competency hearing.

**34.** This Court does not hold that *Smith* was followed in this case; that issue is not present-

record indicates unequivocally that Mr. Meyers was eager for Dr. Robey to examine his client. Meyers Depo. at 31.

In light of the problematic issue whether counsel is to be charged with foretelling *Smith*'s rule, the trial attorney's failure to object to the questionable testimony, and the uncertain potential success of a *Smith* issue on appeal, this Court cannot conclude that Mr. Seymour rendered ineffective assistance in failing to raise the point.

### 6. *Prior Crimes and Charges.*

Finally, petitioner contends that Mr. Seymour should have raised the trial court's error in admitting Dr. Robey's testimony concerning two prior crimes of which Alvord had apparently been convicted and concerning the kidnapping and rape charge of which Alvord had been found not guilty by reason of insanity in Michigan. The capital punishment statute in effect in Florida at the time Mr. Seymour took this appeal provided that "evidence may be presented [at the sentencing hearing] as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated" elsewhere in the statute. Fla.Stat. § 921.141(1) (1973). The enumerated aggravating circumstances included the fact that "the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." *Id.* § 921.-141(5)(b). The mitigating circumstances, on the other hand, included the facts that "the defendant has no significant history of prior criminal activity," *id.* § 921.141(6)(a), that "the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance," *id.* § 921.141(6)(b), and that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." *Id.* § 921.141(6)(f).

Dr. Robey testified at sentencing to several matters now relevant. He stated that the last two quoted mitigating factors, ex-treme disturbance in subsection (b) and lack of capacity in subsection (f), existed in Alvord's case. Trial Rec. at 1178, 1188–89. He described the circumstances surrounding the kidnapping and rape of which Alvord had been found not guilty by reason of insanity, *id.* at 1148–56, and stated his opinion that Alvord was sane under M'Naghten at the time of those crimes. *Id.* at 1159–60. He testified that Alvord had twice been convicted of crimes in Michigan, once for malicious destruction of property and the other for reckless driving. *Id.* at 1165–67. Mr. Meyers objected to the doctor's testimony concerning the Michigan crimes, stating that his client had not been convicted of the kidnap and rape and that testimony about the other two crimes was hearsay.

Petitioner now raises several legal attacks on the admissibility of this testimony which he contends counsel should have pressed on direct appeal. First, he says the information conveyed by Dr. Robey was within the psychiatrist-patient privilege codified at that time at Fla.Stat. § 90.242 (1973). The short answer is that the trial court took considerable care to ensure that Dr. Robey testified only to matters surrounding the Michigan crimes of which he had knowledge independent of communications from Alvord. Next, petitioner cites *Parkin* as grounding a possible argument on appeal. *Parkin,* decided over a decade before *Smith,* held that the fifth amendment rights of a criminal defendant who chooses to plead insanity were not violated when she was ordered by the trial court to cooperate with court-appointed psychiatrists. The court limited the use of such testimony: "[A]ny statements obtained from the patient by the doctor are used as evidence of mental condition only, and not as evidence of the factual truth which may be contained in them." *Id.* at 822. The answers to petitioner's contention that Mr. Seymour should have raised *Parkin* are twofold: first, the record reflects again the care of the trial judge in limiting Dr. Robey's testimony on the Michigan crimes to

ed by this petition and is therefore not before the Court.

facts he knew from sources other than Alvord's statements; and second, Dr. Robey certainly did not come to know of Alvord's criminal record in the course of the custodial examination he made in January 1974, and *Parkin*'s limitations therefore would not apply. Thus, the decision not to raise these matters on appeal was a reasonable tactic.

■ Next, petitioner contends that Mr. Seymour should have argued that introduction of evidence relating to the Michigan crimes violated Florida's capital sentence statute. First, he assertedly should have urged that evidence of the two Michigan misdemeanor convictions be excluded because they were not within the statutory aggravating circumstance requiring conviction of prior capital felony or felony "involving the use or threat of violence to the person." Fla.Stat. § 921.141(5)(b) (1973). Respondent counters by stating that evidence of these misdemeanors was relevant to rebut the statutory mitigating factor that "the defendant has no significant history of prior criminal activity." *Id.* § 921.-141(6)(a).[35] Similarly, respondent states that Dr. Robey's testimony that Alvord was sane under M'Naghten at the time of the Florida crimes goes to rebut the two mitigating factors concerning mental state. *Id.* § 921.141(6)(b) and (f). Respondent's position may or may not be consistent with Florida law as it exists today, *compare Maggard v. State,* 399 So.2d 973, 977–78 (Fla.1981) *with Booker v. State,* 397 So.2d 910, 918 (Fla.1981); *see Henry v. Wainwright,* 661 F.2d 56 (5th Cir.1981), *vacated on other grounds,* 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982); *Proffitt,* 685 F.2d 1266–69 (adopting *Henry*'s analysis), but Mr. Seymour certainly did not render ineffective assistance in choosing not to raise the issue at the time of the appeal.

■ Second, petitioner asserts that Mr. Seymour should have attacked introduction of evidence relating to the Michigan kidnapping and rape, of which Alvord was found not guilty by reason of insanity. This testimony clearly should have been excluded. Alvord was not convicted of those crimes, and they were therefore not properly the subject of the sentencer's attention. Fla.Stat. § 921.141(5)(b) (1973); *Perry v. State,* 395 So.2d 170, 174–75 (Fla. 1981); *Provence v. State,* 337 So.2d 783 (Fla.1976). Mr. Seymour acted reasonably in not raising the issue on appeal, however, because the trial court did not find the aggravating circumstance of prior violent felony conviction, and was supported in his failure to find the mitigating "no significant history of prior criminal activity" by the evidence of prior misdemeanors. Trial Rec. at 97.

For the reasons stated, this Court concludes that Mr. Seymour's representation of Alvord on direct appeal was constitutionally adequate.

D. *Conclusion.*

Petitioner received constitutionally effective assistance of counsel at trial and on direct appeal. Mr. Meyers' performance fell below constitutional standards at the sentencing hearing, but petitioner was not prejudiced thereby under the standard announced in the en banc *Washington v. Strickland* decision. Petitioner is therefore not entitled to habeas relief on the ground of ineffective assistance of counsel.

## II. INADEQUATE PSYCHIATRIC EXAMINATION

Petitioner next argues, as a second independent attack on his conviction, that he received a constitutionally inadequate psychiatric examination in advance of trial.[36] The argument is based primarily on the

---

**35.** Petitioner contends that the quoted mitigating factor is void for vagueness, citing *Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386 (Ga.1976). The Supreme Court considered the clarity of this and other language in the Florida statute in *Proffitt v. Florida,* 428 U.S. 242, 257–58, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976), concluding that it was facially constitutional. Mr.

Seymour was no doubt prescient in choosing not to raise the point.

**36.** This issue was discussed earlier in the context of petitioner's claim of ineffective assistance of counsel on appeal. *See* section I(C)(4), *supra.*

proposition that the trial court was required under constitutional mandate to commit Alvord for observation in order to facilitate the development and presentation of an insanity defense.[37]

■ Indigent defendants are and must be entitled to the assistance of an expert when such is necessary to their defense. *Bush v. McCollum,* 231 F.Supp. 560 (N.D. Tex.1964), *aff'd* 344 F.2d 672 (5th Cir.1965) (per curiam); *see Hoback v. Alabama,* 607 F.2d 680, 682 n. 1 (5th Cir.1979); *Pedrero v. Wainwright,* 590 F.2d 1383 (5th Cir.1979). *Cf. Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Gray v. Rowley,* 604 F.2d 382 (5th Cir.1979). In *Bush,* the earliest case on point in the Fifth Circuit, the court held that due process was violated when the defendant was convicted over an insanity plea without the assistance of a qualified psychiatrist and without expert evidence as to sanity. 231 F.Supp. at 565. Quite similarly, the court in *Blake v. Zant,* 513 F.Supp. 772 (S.D.Ga.1981), stated that "a defendant whose sanity at the time of the alleged crime is fairly in question has *at a minimum* the constitutional right to one psychiatric examination and opinion developed in a manner reasonably calculated to allow adequate review of relevant, available opportunity to utilize the analysis in preparation and conduct of the defense." *Id.* at 787.[38]

■ This Court agrees with Judge Edenfield's holding in *Blake:* under appropriate circumstances, a defendant must be provided a psychiatric examination when such is necessary to a reasonable investigation of an insanity defense. That rule might be extended, as petitioner contends, to require commitment upon a showing that observation in an institutionalized setting is the only way to accomplish a reasonably adequate psychiatric examination of an accused. But this case presents no such circumstances, for Alvord was examined by a thoroughly qualified psychiatrist—one whom he trusted and who possessed intimate knowledge of his psychiatric history. The fact that Dr. Robey concluded that Alvord was sane at the time of the offense is wholly insufficient to entitle the accused to another opinion. *Blake,* 513 F.Supp. at 784 (and cases cited therein). Similarly, the fact that Dr. Robey states now, some eight years later, that his examinations of Alvord were made under adverse circumstances in no way entails the conclusion that the trial court was constitutionally bound to go further than it did in providing a psychiatric examination. The state judge knew only that two psychiatrists had tried unsuccessfully to examine Alvord and had suggested commitment and that Dr. Robey had performed an examination of Alvord adequate to ground a professional opinion. The constitution was satisfied.

Accordingly, habeas relief should be denied on this ground.[39]

### III. USE OF UNDISCLOSED MATERIAL BY THE FLORIDA SUPREME COURT: THE *BROWN* ISSUE

■ Petitioner's third ground for relief is that "the Florida Supreme Court, since at least as early as 1975, has engaged in the continuing practice of requesting and receiving information concerning capital appellants which was not presented at trial

---

**37.** Petitioner also suggests that *Pate* was violated in this case. For the reasons stated in section I(C)(4), *supra,* that argument is rejected.

**38.** Petitioner also relies on *United States v. Taylor,* 437 F.2d 371 (4th Cir.1971), but *Taylor* simply held that the Criminal Justice Act, 18 U.S.C.A. § 3006A (West Supp.1982), applicable to federal prosecutions, required a federal district court to appoint a psychiatrist to examine a defendant upon his request and showing of necessity, and that the statutory showing was made when the only other psychiatric opinion available was based on a "truncated" ten-minute interview.

**39.** The Court notes some unclarity as to whether petitioner effectively exhausted his available state remedies on this point, *see Alvord,* 396 So.2d at 191 (collateral review appeal), but need not pause on the matter in light of respondent's waiver. Answer ¶ II; *see Hopkins v. Jarvis,* 648 F.2d 981 (5th Cir. Unit B 1981); *Messelt v. Alabama,* 595 F.2d 247 (5th Cir. 1979).

and not a part of the trial record or record on appeal." Alvord cannot say whether such material was considered by the state court in deciding his appeal.

The constitutionality of the Florida court's consideration of these materials was considered and upheld in *Brown v. Wainwright,* 392 So.2d 1327 (Fla.), *cert. denied,* 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981). The Eleventh Circuit has upheld the practice without condoning it. *Ford v. Strickland,* 696 F.2d 804, 809–11 (11th Cir. 1983) (en banc) (mandate stayed until March 1, 1983).

Accordingly, habeas relief on this ground should now be denied.

## IV. *MIRANDA*

Petitioner next contends that *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was violated when the officer who arrested him in Michigan was allowed to testify to Alvord's post-arrest statement, "I'm a rapist, not a . . . thief." He contends that Miranda was violated because, first, the officer "neglected to read petitioner the warnings as printed on a police department form"—the record is unclear whether the officer informed Alvord of his right to have counsel appointed if he was indigent; and second, Alvord never signed a written waiver of his fifth amendment privilege.

The officer, Detective Dufour, testified in the proffer that he told Alvord he was a police officer, that he did not have to say anything, that anything he said could later be used against him, and that he had a right to have an attorney. Trial Rec. at 921. Dufour also stated that Alvord did not request an attorney, that no one promised Alvord immunity or threatened or coerced him into making a statement, and that Alvord told him he understood his rights. *Id.* at 921–22. The detective later testified to the jury that upon being questioned about "another matter," [40] Alvord had said, "I'm a

rapist, not a . . . thief." *Id.* at 941. He described Alvord's explanation—"He said, 'I'm wanted for three murders in Florida' "—and stated that when asked whether he did it, Alvord responded "They have got to prove it." *Id.* at 942.

Introduction of this testimony did not violate *Miranda. See North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *see also* 28 U.S.C. § 2254(d); *Alvord,* 322 So.2d 536–38 (direct appeal). Further, no specific factual material before this Court undermines the trial court's conclusion that the statement was made voluntarily and in full compliance with due process principles.

Habeas relief is therefore denied on this ground.

## V. GENERAL ATTACKS ON THE SENTENCE OF DEATH

Petitioner next mounts several constitutional attacks on his sentence. His fifth ground for relief is that the death penalty is unconstitutional as applied in his case. To support that ground, he argues that "[d]eath sentences are imposed irregularly, unpredictably, and whimsically in cases which are no more deserving of capital punishment under any rational standard that considers the character of the offender and the offense, than many other cases in which sentences of imprisonment are imposed." Petition at 27. He also contends that "[t]he theoretical justifications for capital punishment are groundless and irrational in fact." *Id.* at 28. His sixth ground is that the sentence violated the equal protection clause because it is imposed discriminatorily on the basis of sex and poverty. Ground nine also comprises an equal protection argument: Alvord contends the death penalty is imposed "arbitrarily and discriminatorily to punish the killing of white persons as

---

**40.** The trial court was properly careful not to let in evidence concerning this "other matter."

Trial Rec. at 925–27.

opposed to black persons ...."[41] Finally, petitioner's seventh and eighth grounds are, respectively, that the potential for capital punishment is used in Florida to coerce guilty pleas from those accused of murder and that the death penalty was "too great" in this case.

Each of these arguments was resolved in *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978). First, the *Spinkellink* court read several modern Supreme Court decisions on the death penalty to hold that

> capital punishment is not unconstitutional per se, and that a state, if it chooses, can punish murderers and seek to protect its citizenry by imposing the death penalty— so long as it does so through a statute with appropriate standards to guide discretion. If a state has such a properly drawn statute—and there can be no doubt that Florida has—which the state follows in determining which convicted defendants receive the death penalty and which receive life imprisonment, then the arbitrariness and capriciousness condemned in *Furman* [*v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346] have been conclusively removed.

*Id.* at 605 (footnote omitted).[42] Petitioner's charge of discrimination on the basis of race, sex, and poverty was put to rest, *Spinkellink,* 578 F.2d at 616; *see Smith v. Balkcom,* 660 F.2d 573, 584–85 (5th Cir. 1981), *modified,* 671 F.2d 858 (5th Cir.1982), and the *Spinkellink* court similarly held that petitioner's inducement of guilty pleas argument is without merit. 578 F.2d at 606–09.

█ Petitioner lastly contends that the death penalty was "too great" in his case.

Essentially, petitioner asks this Court to review the many past Florida capital sentence appeals to determine whether this sentence of death is consistent with those decisions. But it is "not necessary for [a] district court to undertake such a case-by-case comparison." *Id.* at 604. The Court need only conclude that Florida's statutory capital sentence procedure is facially constitutional, *Proffitt,* and was followed in this case. But for the specific flaw noted in section VII, *infra,* this Court so concludes.

Habeas relief should be denied on grounds six through nine of the petition.

## VI. THE "DEATH–PRONE" JUROR

█ In his tenth ground for relief, petitioner argues that the trial court violated the requirements of the sixth, eighth, and fourteenth amendments by refusing to excuse for cause a venireman who stated his view at voir dire that any person convicted of first degree murder should be sentenced to die. Trial Rec. at 315.[43] In denying the defense challenge, the trial judge stated that "it takes a majority of the verdict on the second stage of the trial for a recommendation," and that the venireman had not "said he is biased as far as the finding of any guilt or innocense is concerned." *Id.* at 315–16. The defense later excused the juror peremptorily. *Id.* at 401.

Respondent apparently understands petitioner to argue that *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), was violated by the trial court's failure to excuse the juror. But the specific dictate of *Witherspoon* was clearly not violated here: no venireman was excused for cause on the basis of a generalized objection

---

**41.** Petitioner also finds a constitutional basis for this contention in the eighth amendment and the due process clause of the fourteenth amendment. Petition at 29.

**42.** *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944

(1976); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

**43.** Respondent argues that this issue amounts to a "question of law which has been resolved adversely to petitioner and therefore requires no further hearing." Answer to Petition at 26. But applying federal constitutional law to the historical facts of the case is precisely the function of a federal court in ruling on a petition for habeas corpus. 28 U.S.C. § 2254(a); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 767, 66 L.Ed.2d 722 (1981).

to the death penalty. *Witherspoon* did follow what has long been the law, however, in stating that an accused has a right to an impartial jury and that a capital sentence imposed by a "hanging jury" violates fundamental constitutional principles. 391 U.S. at 523, 88 S.Ct. at 1778. This is all the more true in light of recent capital punishment decisions of the Supreme Court, which require that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg,* 428 U.S. at 189, 96 S.Ct. at 2932. Florida's statute provides such suitable direction, *Proffitt,* 428 U.S. at 259–60, 96 S.Ct. at 2970, but the views of the juror in question here replace that discretion by a mandatory death sentence.

■ A venireman who believes that the death penalty should automatically and in every case flow from conviction of first degree murder must be excused. *See Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); *Crawford v. Bounds,* 395 F.2d 297 (4th Cir.1968), *cert. denied,* 397 U.S. 936, 90 S.Ct. 941, 25 L.Ed.2d 117 (1970). In this case, the trial court's error in refusing to excuse such a venireman for cause forced petitioner to expend one of his allotted peremptory challenges to excuse the individual from serving on the jury. But the record reflects and petitioner concedes that he did not exhaust his peremptory challenges. Petitioner's Memorandum, November 1, 1982. *See* Fla. R.Crim.P. 3.350 (ten peremptory challenges allowed in capital case). Petitioner was therefore in no way prejudiced by the trial court's error in not excusing the jury for cause. *See Stroud.*

Relief must therefore be denied on this ground.

## VII. UNFETTERED SENTENCING DISCRETION AND NONSTATUTORY AGGRAVATING FACTORS

■ Petitioner's eleventh ground for relief raises several attacks on his sentence

and the findings upon which it was based. His first attack is easily met. Petitioner contends that his sentence was unconstitutional because "[n]one of aggravating circumstances found to support the death sentence was alleged in the indictment...." Petition at 31. Mr. Meyers moved to dismiss the indictment on March 28, 1974, Trial Rec. at 78, but this untimely motion apparently did not raise the claim now asserted. The claim is therefore arguably waived. *Wainwright v. Sykes. But see* Respondent's Answer ¶ II; *Hopkins v. Jarvis,* 648 F.2d 981 (5th Cir. Unit B 1981). Even assuming this argument is properly presented, petitioner has cited no decision holding that such an enumeration of aggravating circumstances is required. *See Spinkellink,* 578 F.2d at 609. In light of this absence of authority and considering the limited number of aggravating circumstances available to the prosecution in Florida, Fla.Stat. § 921.141(5) (1973), the Court finds petitioner's argument to be without merit.

■ Petitioner's third attack also fails. He contends that "[n]one of the aggravating circumstances used to support the death sentence was found to exist beyond a reasonable doubt ...." Petition at 32. The jury was properly instructed. Trial Rec. at 1230.

■ Petitioner's major argument is that his sentence was unconstitutional because the sentencer was allowed to consider, and actually relied in part upon nonstatutory aggravating circumstances. It cannot be disputed that evidence concerning Alvord's potential for dangerousness in the future was allowed in at the sentencing hearing through the testimony of Dr. Robey. *See* section I(B), *supra.* The sentencing judge properly instructed the jury that it could consider only those aggravating factors listed in the statute. Trial Rec. at 1227. The findings entered by the judge, however, included this statement: "The Court finds that based on all the facts and circumstances presented the defendant, [Alvord], has been and would continue to be a danger and

a menace to society and therefore must pay the ultimate penalty, death by electrocution, as provided by the laws of the State of Florida." Trial Rec. at 99. The quoted sentence does not appear among the four findings listed by the judge as aggravating circumstances, nor does it appear among the eight findings listed in mitigation; instead, it comprises the concluding sentence of the order.

The Courts of Appeals for the Fifth and Eleventh Circuits have held squarely that a death sentence is unconstitutional if based on evidence of findings of aggravating circumstances not included among those listed in the Florida statute. *Proffitt,* 685 F.2d at 1266–69; *Henry v. Wainwright,* 661 F.2d 56 (5th Cir.), *vacated on other grounds,* 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982) (adopted in *Proffitt*). A defendant's potential for dangerousness in the future is not a statutory aggravating factor in Florida.[44] *See* Fla.Stat. § 921.141(5). *Cf. Smith,* 101 S.Ct. at 1870 (considering Texas statute, which includes future dangerousness as aggravating circumstances). Indeed, the *Proffitt* court held the death sentence in that case unconstitutional precisely because the sentencing judge had included among his findings the statement that Proffitt was a "danger and a menace to society":

> In considering [*Proffitt's*] 'propensity to commit [murder]' and the danger he posed to society, the trial court transcended the list of aggravating factors set forth in the Florida statute and substitut-

ed his own judgment of what circumstances justify capital punishment for that of the Florida legislature. In so doing, the trial judge not only committed error under the state law; he also exceeded the federal constitutional limitations imposed by *Furman* on capital sentencing by increasing the risk that the death penalty would be imposed in an arbitrary and capricious manner.

685 F.2d at 1267 (citation omitted).

This case is indistinguishable from *Proffitt* in this regard. In both cases, the state introduced evidence at the sentencing phase relating to the defendant's potential for dangerousness in the future, *see* 685 F.2d at 1267 n. 61, and in both cases the jury was correctly instructed to consider only statutory aggravating circumstances. *Id.* at 1267. The only possible difference is that the sentencing judge in *Proffitt* presumably included future dangerousness among his express findings of aggravating factors, while Alvord's sentencer stated his reliance on that nonstatutory factor in the closing sentence of his order. This Court cannot conclude from the textual placement of the trial judge's finding of future dangerousness that the nonstatutory finding was not considered in imposing the death sentence, for to so conclude would hazard an unnecessary risk that the death sentence in this case was imposed on the basis of considerations made impermissible by the Florida Legislature.[45] Alvord's sentence cannot stand.

---

**44.** The only statutory aggravating circumstance that might conceivably apply is that "[t]he defendant knowingly created a great risk of death to many persons." That factor, which was found to exist in this case, relates to the character of the offense, not of the accused.

Respondent insists that the finding of future dangerousness did not relate to a nonstatutory aggravating factor, but rather negated a mitigating circumstance. It does not state what statutory mitigating factor the finding might possibly negate, nor does it cite authority in support of this bootstrapping argument.

**45.** In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court was invited to ignore a sentencing judge's offhand remark to the effect that he

was not permitted by statute to consider nonstatutory mitigating factors. In line with its holding in *Lockett,* the Court remanded to allow the state courts to "consider all relevant mitigating evidence." 102 S.Ct. at 877. "Although one can reasonably argue that these extemporaneous remarks are of no legal significance, ... *Lockett* compels a remand so that we do not 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.' " *Id.* at 878 (O'Conner, J., concurring) (quoting *Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965).

This case mirrors *Eddings* in that nonstatutory aggravating circumstances were considered in imposing the death penalty, but the risk in assuming proper consideration by the sentencing judge is precisely the same.

## VIII. *LOCKETT:* RESTRICTION OF MITIGATING CIRCUMSTANCES

Petitioner's final claim, number twelve, is that the sentencing jury was impermissibly precluded from considering mitigating circumstances other than those listed in section 921.141(5), Fla.Stat. Alvord does not contend that he was prevented from introducing evidence at the sentencing of nonstatutory mitigating factors. Rather, he contends that the advisory jury was prevented from considering nonstatutory mitigating circumstances by the terms of the sentencing court's instructions. Respondent is apparently satisfied to note that no restrictions were placed on petitioner's right to present evidence to the jury. Answer to Petition at 28.

Petitioner's evidence of nonstatutory mitigating circumstances was notably sparse in this case. The major part of Dr. Robey's testimony concerned Alvord's history of mental illness and his mental state at the time of the offense in question. This information is relevant to the two psychiatric mitigating circumstances listed in Florida's statute. *See* Fla.Stat. § 921.141(6)(b) and (f).[46] He did unquestionably state one extremely important opinion: that Alvord could be rehabilitated with proper treatment. Trial Rec. at 1191–92. He also testified that petitioner was married and a father. Neither the defendant's potential for rehabilitation nor his family circumstance is among the statutory mitigating factors.

In his instructions, the sentencing judge stated to the jury that "[t]he aggravating circumstances which you may consider *are limited* to such of the following as may be established by the evidence." *Id.* at 1227. After listing the statutory aggravating circumstances, the judge continued:

If you do not find that there existed any of the aggravating circumstances which has [sic] been described to you, it would be your duty to recommend a sentence to life imprisonment. Should you find one or more of these aggravating circumstances to exist, it will then be your duty to determine whether or not sufficient mitigating circumstances exist to outweigh the aggravating circumstances found to exist.

The mitigating circumstances which you may consider if established by the evidence are these:

and proceeded to list the statutory mitigating factors. *Id.* at 1228–29. A few moments later, the judge instructed the jury that

"[i]f one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence which should be imposed."

*Id.* at 1230.[47]

The death penalty cannot constitutionally be imposed on the basis of a statute or instructions that prevent the sentencer from considering nonstatutory mitigating circumstances. *Lockett v. Ohio,* 438 U.S. 586, 596, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978) (plurality); *Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978) (plurality). The Fifth and Eleventh Circuits have interpreted *Lockett* several times. In *Chenault v. Stynchcombe,* 581 F.2d 444 (5th Cir.1978), the court read *Lockett* and *Bell* "to mandate that the judge clearly instruct the jury about mitigating circumstances and the option to recommend against death." *Id.* at 448.[48] Thus, *Lockett*

---

**46.** Dr. Robey's conclusion that Alvord was sane under M'Naghten at the time of the Florida crimes is arguably evidence of a nonstatutory mitigating circumstance in light of the difference between the M'Naghten standard and the tests stated in subsections 921.141(6)(b) and (f), Fla.Stat.

**47.** Mr. Meyers did not object to the sentencing instructions. Respondent has waived any pos-

sible exhaustion argument that might flow from that fact, however. *See* Answer to Petition ¶ 3. *Cf. Ford,* 696 F.2d at 812.

**48.** The *Chenault* court did not consider the merits of Chenault's *Lockett* claim because he had not exhausted state remedies on the issue. 581 F.2d at 447. It did hold, however, that the *Lockett* argument presented by Chenault "im-

is violated not only by the exclusion of evidence relating to nonstatutory mitigating factors, but by instructions that limit "the sentencer's consideration of that evidence except as if related to the statutory mitigating factors." *Washington v. Watkins,* 655 F.2d 1346, 1375 (5th Cir. Unit A 1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982).

The Fifth Circuit has at least twice faced glaring violations of *Lockett.* In *Watkins,* the sentencing jury was instructed to consider "only" certain enumerated aggravating factors; it was then told to "consider the following elements of mitigation," whereupon the judge listed only two of the several statutory mitigating circumstances. The Fifth Circuit read these instructions to limit the jury's consideration of nonstatutory mitigating factors, and concluded that the charge was not saved by the trial judge's statement to the jury that "[i]n reaching your decision you must obviously consider the detailed circumstances of the offense for which the defendant was convicted and the defendant himself." *Id.* at 1369. In *Spivey v. Zant,* 661 F.2d 464 (5th Cir. Unit B 1981), decided only one month after *Watkins,* the court faced a similarly glaring *Lockett* violation: the trial judge's instructions contained express mention of aggravating factors only. Circumstances in mitigation were noted only implicitly when the court told the jury to "consider all the evidence" in reaching a sentencing decision. The Fifth Circuit held that a jury must "receive clear instructions which not only do not preclude consideration of mitigating factors, *Lockett,* but which also 'guid[e] and focu[s] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender ....' " *Id.* at 471 (quoting *Jurek,* 428 U.S. at 274, 96 S.Ct. at 2957). It concluded that the instructions at issue were constitutionally inadequate for their failure to "describe the nature and function of mitigating circumstances," or guide the jury "toward the consideration of mitigating circum-

plicate[d] a substantial denial of a federal con-

stances by special interrogatories." *Id.* at 472.

More recently, however, the Eleventh Circuit has faced a *Lockett* argument attacking jury instructions essentially identical to those in this case. In *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983) (en banc), the trial judge instructed the jury to consider "only" the statutory aggravating circumstances and "to consider the following" mitigating circumstances. 696 F.2d at 812. He listed all statutory aggravating and mitigating circumstances. Thus, the word "only" distinguished the instructions on aggravating factors from those on mitigating factors.

█ The *Ford* court upheld the instructions after noting that its task was to "determine the interpretation a reasonable juror might give the words of the instruction in question." *Id.* (citing *Sandstrom v. Montana,* 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979)). This Court is led by *Ford* to the same result. First, the trial court's omission of the word "only" in listing the mitigating circumstances indicated to the jury that they might consider factors other than those listed by the judge in mitigation of sentence. *See Ford,* 696 F.2d at 812. Second, the instructions included a list of all statutory mitigating factors and did not limit the jury to considering only those listed. *See Id.* at 812–13; *cf. Washington v. Watkins,* 655 F.2d at 1368. Third, petitioner was permitted to introduce evidence freely, without limitation to that relevant to a statutory mitigating factor. *See Ford,* 696 F.2d at 813. Fourth and finally, the sentencing judge's order refers to "*any* circumstances which would mitigate the sentence in this case." *See Id.*

"Under these circumstances, a rational conclusion is that the jury did not perceive a restriction on the use of any mitigating evidence." *Id.* Relief on this ground is denied.

## IX. CONCLUSION

Petitioner's several claims challenging the constitutionality of his conviction are

stitutional right." *Id.* at 448.

without merit, and habeas relief on those grounds is hereby DENIED. For the reasons stated in section VII of this Opinion, however, petitioner's death sentence must be set aside. In the absence of either party's timely filed notice of appeal, the state of Florida is hereby DIRECTED to conduct a new sentencing hearing within a reasonable time and in the manner provided by section 921.141, Fla.Stat. If no notice of appeal is filed and the State fails to hold another sentencing hearing within a reasonable time, the State is ORDERED to vacate petitioner's sentence and to impose a sentence less than death in accordance with state law. *See* Fla.Stat. § 775.082.

## ORDER

On Motion to Alter or Amend Judgment

The Court has for consideration a motion to alter or amend judgment, filed by respondent pursuant to Rule 29, Fed.R.Civ.P. Rule 11, 28 U.S.C. foll. § 2254. The motion is procedurally proper, *see Browder v. Director, Department of Corrections,* 434 U.S. 257, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978), was timely filed, and has drawn response from petitioner.

Respondent seeks reconsideration of that portion of this Court's March 23, 1983 Memorandum Opinion that set aside petitioner's death sentence and required a new sentencing hearing. Respondent's first argument is ironic in light of the vigor with which he resisted the assertedly improper evidentiary hearing held in this case, *see In re Wainwright,* 678 F.2d 951 (11th Cir.1982) (denying petition for writ of prohibition); he contends that this Court should "reserve ruling" on the instant motion pending decision in *Barclay v. Florida,* 411 So.2d 1310 (Fla.1981), *cert. granted,* —— U.S. ——, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982), and *Zant v. Stephens,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982) (certifying question to Georgia Supreme Court). Secondly, he argues that *Proffitt v. Wainwright,* 685 F.2d

1227 (11th Cir.1982), does not require that Alvord's sentence be set aside.

The Court will consider respondent's second argument first. In *Proffitt,* the Eleventh Circuit overturned a death sentence on precisely the ground involved in this case: by considering Proffitt's potential for dangerousness in the future, the sentencing judge had "exceeded the federal constitutional limitations imposed by *Furman* [*v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] on capital sentencing by increasing the risk that the death penalty would be imposed in an arbitrary and capricious manner." 685 F.2d at 1267. Having already determined that two other aggravating factors relied upon by the sentencing judge were unconstitutional under *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the *Proffitt* court was faced with one valid aggravating factor remaining and no clear finding of mitigating circumstances. 685 F.2d at 1268. Fully recognizing the *Zant* case, it refused to deem the trial court's consideration of nonstatutory aggravating circumstances harmless error even in the absence of mitigating circumstances against which the remaining aggravating factor might come up short: "Only where the factors supporting the death sentence are so clear that proper application of the statute by reasonable persons could produce no other result should a sentence be affirmed despite constitutional error." *Id.* at 1269 & n. 64. This case presents facts even less conducive to a finding of harmless error than were present in *Proffitt,* for there remain in this case several mitigating circumstances to be weighed against such valid aggravating factors as remain for consideration.[1]

Several months after *Proffitt,* the en banc Eleventh Circuit decided *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983). In *Ford,* the Florida Supreme Court had invalidated three of the eight aggravating factors found to exist by the sentencing judge: two were supported by insufficient evi-

---

1. The pendency of a petition for rehearing en banc in *Proffitt* does not persuade this Court to

ignore the precedential weight of that decision.

dencé, and one was based on the same aspect of the crime as another aggravating factor. *Ford v. State,* 374 So.2d 496, 501–03 (Fla.1979). The Eleventh Circuit faced the question whether the Florida Supreme Court erred in failing to require resentencing in these circumstances. In its brief per curiam opinion, the en banc court affirmed denial of relief on this ground, but remanded this aspect of the petition to the district court for further proceedings in light of the eventual decision in *Barclay.* A majority of the judges recognized in their various separate opinions, however, that the court's decision to impose a harmless error rule and to remand in anticipation of *Barclay* depended on the fact that the error found to exist in the sentencing proceedings was of state law only; had the sentencer heard evidence it was constitutionally prohibited from hearing or relied upon nonstatutory aggravating circumstances that were foreclosed by *Proffitt* and *Furman,* the sentence would have been set aside. 696 F.2d at 814 (Roney, J., with whom four judges joined); 696 F.2d at 824 (Godbold, J., with whom Judge Clark joined). *See Henry v. Wainwright,* 661 F.2d 56, 59–60 (5th Cir.1981), *vacated and remanded on other grounds,* 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326, *judgment reinstated,* 686 F.2d 311 (5th Cir.1982).

A post-*Furman* capital sentencing statute structured as Florida's requires the sentencing body to weigh those statutory aggravating factors it finds to exist against whatever circumstances it finds in mitigation. This decisional mechanism has been upheld under the Eighth Amendment as a rational means of assuring "that the death penalty will not be imposed in an arbitrary or capricious manner." *Proffitt v. Florida,* 428 U.S. 242, 252–53, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976). The difference between the errors in *Ford* on the one hand and in *Proffitt v. Wainwright, Henry,* and this case on the other is that between state-law errors within the constitutionally mandated structure and errors of constitutional dimension that infect that structure. The Supreme Court's opinion certifying a question in *Zant* suggests that a state appellate court may in some circumstances impose a harmless error rule without doing violence to its constitutional role in the capital sentencing structure. But that is not to say that a federal court may overlook infectious error of a constitutional magnitude, for such error draws into question the structure itself.

Finally, the Eleventh Circuit very recently decided *Goode v. Wainwright,* 704 F.2d 593 (11th Cir.1983). *Goode* involved precisely the issue now before this Court, and the Goode court distinguished *Ford* and declined to await decision in *Barclay* and *Zant* for just the reasons stated in this Order. *Id.,* at 612.

Accordingly, respondent's motion to alter judgment should be, and it is hereby DENIED.

IT IS SO ORDERED at Tampa, Florida this 5 day of May, 1983.